UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 11-CV-0211-CVE-PJC |
| BRIAN D. FOX, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Now before the Court are the Unopposed Motion to Enter Final Judgment as to Defendant Brian D. Fox (Dkt. # 40) and Plaintiff's Motion for Order of Disgorgement, Prejudgment Interest and Third-Tier Civil Penalties against Defendant Brian D. Fox and Brief in Support (Dkt. # 44). Defendant consented to the entry of an agreed final judgment and the Securities and Exchange Commission (SEC) filed an "unopposed" motion for entry of judgment. Dkt. # 40. Defendant now claims that he did not understand that he would give up his right to challenge the facts alleged in the complaint or that the agreed judgment would include an award of disgorgement and a civil monetary fine, and he asks the Court to deny plaintiff's motion for entry of judgment. Dkt. # 50, at 1.

### I.

Fox served as the president, chief executive officer (CEO), and chairman of the board of Powder River Petroleum International, Inc. (Powder River) from December 2003 to July 2008, and he also served as Powder River's chief financial officer (CFO) from December 2003 to August 2007. Dkt. # 9, at 4. Powder River maintains its headquarters in Alberta, Canada, but the SEC alleges that Powder River conducted investor-related activities from its office in Tulsa, Oklahoma. Id. at 5. In 2004, Powder River began soliciting investors in Asia and it entered into contracts with many Asian

investors. In these contracts, the investors agreed to pay a principal amount, and Powder River agreed to repay an agreed percentage of the principal each year. Id. at 6. After the principal was fully repaid, the investor would continue to receive payments from Powder River based on the investor's percentage share of the company's oil and gas interests. Id. The SEC alleges that Fox negotiated with the Asian investors and signed the contracts on behalf of Powder River. Id. at 1, 7.

Powder River treated the investment income as revenue in its public filings, but the SEC states that the money from Asian investors should have been listed as loans. Id. at 6. The SEC claims that Powder River significantly overrepresented its income by this false and misleading characterization of the Asian investments. From 2004 to 2007, Fox allegedly misrepresented the nature of the guaranteed minimum payments to Asian investors when communicating with auditors and outside consultants. Id. at 7-8. Fox resigned as CFO of Powder River in August 2007, but he continued to serve as CEO, president, and chairman of the board. Id. at 4, 8. Fox continued to sign Powder River's quarterly and annual filings, and Powder River represented to the SEC that the proceeds from Asian investors were revenue. Id. at 8. In the second quarter of 2007, Powder River instituted a policy of using proceeds from new investors to pay the guaranteed minimum payments to existing investors and, by March 2008, Powder River was making the guaranteed minimum payments entirely from the proceeds obtained from new investors. Id. According to the SEC, Powder River's obligation to investors was almost double the incoming oil and gas revenue. Id. at 9. In March 2008, an outside consultant conducted an audit of Powder River's finances and determined that Powder River's accounting treatment of the investment income was improper. Id. Powder River filed a Form 8-K in March 2008 publicly disclosing that Powder River's financial statements for the first, second, and third quarter of 2007 were not reliable. Id. at 10.

The improper accounting treatment of the funds from Asian investors was not the only misrepresentation in Powder River's public filings. Fox represented to accountants that Powder River had acquired oil and gas leases in Texas and New Mexico, even though Powder River actually forfeited its right to the leases before the agreements could be completed. Id. at 11. Powder River inflated the value of its proven reserves in SEC filings based on questionable reserve estimates and the inclusion of properties not owned by Power River. Id. at 12. Fox drafted and disseminated false press releases about Powder River's financial status, even though Fox allegedly knew that the press releases misrepresented Powder River's income. Id at 13-14. Fox received a bonus of $320,000 from Powder River based on the company's revenue, and the SEC claims that this bonus is directly linked to inflated revenues reported by Fox. Id. at 21.

On April 8, 2011, the SEC filed this case alleging six statutory and regulatory violations against Fox. The SEC seeks a permanent injunction preventing Fox from serving as an officer or director of any public company or from engaging in future violations of, inter alia, Sections 10(b) and 13(b)(5) of the Securities and Exchange Act of 1934 (Exchange Act), and rules promulgated by the SEC to enforce these sections of the Exchange Act. The SEC also asks the Court to order defendant to disgorge all wrongfully obtained funds, plus prejudgment interest, and to impose a civil monetary fine. Fox appeared pro se and filed an answer to the complaint. Dkt. # 7. The SEC filed an amended complaint (Dkt. # 9) but Fox failed to file an answer to the amended complaint. The SEC obtained the entry of default (Dkt. # 16) against Fox, but the default was later set aside when counsel entered an appearance on behalf of Fox. Dkt. # 22.

Fox appeared for his deposition on June 20, 2012, and the SEC states that the "first half of the deposition had gone poorly for Fox." Dkt. # 48, at 2. Fox's attorney asked the SEC to adjourn

3

the deposition and the SEC presented Fox with a consent form and a proposed judgment. Id. Fox met with his attorney and counsel for the SEC for about an hour and a half, and counsel for the SEC left the room whenever Fox requested. Id. Fox signed the consent form before a notary public and the deposition was adjourned. Fox agreed to the entry of a judgment enjoining him from committing future violations of sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934. Dkt. # 40-1, at 1. Fox also agreed to the entry of a money judgment for disgorgement, prejudgment interest, and a civil fine in amounts to be determined by the Court. Id. at 2. In connection with the SEC's request for disgorgement, prejudgment interest, and a civil fine, Fox agreed to the following conditions:

> (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the complaint; (b) Defendant may not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of such motion, the allegations of the First Amended Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence without regard to the standards for summary judgment . . . .

Id. Fox represented that he signed the consent form voluntarily and that "no threats, offers, promises, or inducements of any kind have been made by the [SEC] . . . to induce Defendant to enter into this Consent." Id. at 3.

The SEC filed an unopposed motion for entry of judgment. Dkt. # 40. However, the proposed judgment did not state the amount of disgorgement or other monetary relief to be awarded to the SEC, and the Court determined that this issue should be resolved before the entry of judgment. Dkt. # 41. The Court entered a briefing schedule (Dkt. # 43) as to the monetary relief to be awarded in the judgment, and the SEC filed a motion for disgorgement, prejudgment interest, and a third-tier civil fine. Dkt. # 44. Plaintiff filed an untimely response, arguing that the award of any monetary relief would be "unjust," because he believed he agreed to the entry of a judgment as to injunctive

4

relief only. Dkt. # 46. He also challenges the factual allegations of the amended complaint. Id. at 2-4.

## II.

### A.

Defendant argues that his consent to entry of an agreed judgment is invalid, because he did not understand that he would be stipulating to the facts alleged in the complaint if he signed the consent. Dkt. # 46, at 2. He also claims that he did not realize that he was agreeing to the entry of a judgment including monetary relief. Id. However, defendant cites no authority supporting his argument that the consent is invalid, in whole or in part, because he did not fully understand the terms of the consent and the proposed judgment. The Tenth Circuit follows the general rule that a party may not avoid enforcement of a written agreement because he claims he did not read or understand it unless he can show that he signed the written agreement because of fraud or false representation. Elsken v. Network Multi-Family Sec. Corp., 49 F.3d 1470, 1474-75 (10th Cir. 1995). In this case, defendant had ample time to read the consent form and he was represented by counsel at the deposition. See Dkt. # 49 (deposition transcript evidencing that defendant agreed to sign consent form and that the terms of the consent form were explained to defendant in the presence of his attorney). He has made no allegations of fraud or misconduct on the part of the SEC, and his argument to set aside the consent form is based solely on his own alleged misunderstanding of the parties' agreement. The terms of the consent form are clear and unambiguous and defendant does not claim that he was misled by the language of the consent form. The Court also notes that the plain language of the consent form states that defendant "may not challenge the validity of the Consent . . . ." Dkt. # 40-1.

The Court finds that defendant is bound by the terms of the consent form, and that he may not challenge the facts alleged in the first amended complaint or the SEC's right to seek monetary relief. Defendant's filings (Dkt. ## 46, 50) directly challenge the factual allegations of the first amended complaint, but defendant waived his right to do so and the Court will accept the facts alleged by the SEC as true for the purpose of ruling on the pending motions. Defendant asks the Court to award the SEC no monetary relief, but he does not challenge the SEC's arguments concerning the amount of monetary relief. It is clear that defendant knew that the Court would consider the SEC's request for disgorgement, prejudgment interest, and a civil penalty as part of the final judgment, and the Court will include monetary relief in the judgment if the SEC establishes that such relief is appropriate.

## B.

The SEC asks the Court to award disgorgement, prejudgment interest, and a third-tier civil penalty as part of the judgment. Defendant has consented to inclusion of this relief in the judgment in amounts to be determined by the Court. Dkt. # 40-1, at 2. The SEC asks the Court to order disgorgement in the amount of $320,000, plus prejudgment interest of $59,841.38, and a third-tier civil penalty of up to $150,000.

Disgorgement is an equitable remedy "designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." SEC v. First Pacific Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998). Disgorgement is remedial rather than punitive in nature, and a defendant is required to pay disgorgement only as to gains "causally connected to the violation." SEC v. Maxxon, Inc., 465 F.3d 1174, 1179 (10th Cir. 2006); see also SEC v. Cavanaugh, 445 F.3d 105, 116 n.25 (2d Cir. 2006) (district court may not award additional

amounts of disgorgement solely to punish defendant, and amount of disgorgement is limited to defendant's unjust enrichment). "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1475 (2d Cir. 1996). "Because such calculations are not capable of exactitude, any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." SEC v. Haligiannis, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007).

The SEC requests that the Court order disgorgement in the amount of $320,000, because defendant received a bonus from Powder River in this amount based on the inflated net income reported by defendant. According to the Form 10-K filed by Powder River on December 31, 2007, Powder River paid defendant a "cash bonus of 10% of the Company's net income before taxes to the Company that exceeds $750,000 per quarter." Dkt. # 45-2, at 24. For the year ending December 31, 2007, Fox received a bonus of $320,000. Id. The amended complaint states that defendant received this bonus because he fraudulently inflated Powder River's revenue, and the Court accepts this factual allegation as true. Dkt. # 9, at 21. The SEC states that this is a conservative estimate of defendant's unjust enrichment, because it is possible that his 2007 annual salary of $909,420.27 could also be linked to Powder River's inflated revenue reported by defendant. The Court finds that the SEC has presented sufficient evidence causally connecting the $320,000 bonus to defendant's unlawful conduct, and defendant should be ordered to disgorge this amount.

The SEC also requests prejudgment interest on the $320,000 from the date Fox received the bonus, December 31, 2007, until the date on which judgment is entered. Dkt. # 44, at 13. The SEC has calculated prejudgment interest based on the interest rate for underpayment of federal income

7

taxes, and states that the appropriate amount of prejudgment interest for the period December 31, 2007 through October 31, 2011 is $59,841.38. The Court has the equitable authority to award prejudgment interest on an order of disgorgement. SEC v. First Jersey Securities, Inc., 101 F.3d 1450 (2d Cir. 1996); SEC v. HedgeLender LLC, 786 F. Supp. 2d 1365 (S.D. Ohio 2011). "Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations." SEC v. Sargent, 329 F.3d 34, 40 (1st Cir. 2003). The SEC has adopted the tax underpayment rate for prejudgment interest in its administrative proceedings and courts routinely apply this rate when awarding prejudgment interest on an order of disgorgement. SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1099 (9th Cir. 2010); SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers, 825 F. Supp. 2d 26 (D.D.C. 2010). Defendant does not challenge the SEC's calculation of prejudgment interest. The Court has reviewed the SEC's calculation of prejudgment interest (Dkt. # 45-6) and finds that the SEC should be awarded prejudgment interest in the requested amount, plus prejudgment interest at the applicable quarterly interest rate on the disgorgement award from November 1, 2011 to this date.

A civil fine is authorized under 15 U.S.C. § 78u(d)(3), and the SEC asks the Court to impose a third-tier fine under the statutory scheme. The Court may order a defendant to pay a third-tier fine of $150,000[1] or the "gross amount of pecuniary gain to such defendant" if the defendant's violation of federal securities laws "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in substantial losses or created significant risk of losses to other persons." 15 U.S.C. § 78u(d)(3). The imposition of a

---

[1]  By statute, the maximum third tier fine is $100,000. 15 U.S.C. § 78u(d)(3). This amount has been adjusted for inflation and the current maximum third tier fine is $150,000. 17 C.F.R. § 201.1002.

8

fine is discretionary and courts have considered several factors in determining the amount of a civil fine:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

In this case, defendant recruited Asian investors and intentionally misrepresented the nature of these investments in public filings. Defendant continued to recruit investors and essentially created a Ponzi scheme of paying existing obligations from new investments. Defendant's scheme harmed the Asian investors, many of whom have not been repaid, and he significantly misrepresented Powder River's revenues and proven reserves in public filings and press releases. Defendant's conduct was egregious and intentional, and his conduct caused substantial losses to Powder River's investors. The SEC states that in 2000 the Alberta Securities Commission issued a cease and desist letter to defendant and barred him from serving as an officer or director for 18 months, and this suggests that defendant is recidivist. Dkt. # 9, at 5; Dkt. # 44, at 16 n.4. Defendant has provided no evidence as to his ability to pay a fine, and the Court will not consider this as a factor. The Court finds that defendant engaged in fraudulent and deceitful conduct causing substantial losses to Powder River's investors, and that a third tier fine is appropriate. The Court will impose a third-tier civil fine of $100,000. This amount is sufficient to punish defendant for his egregious behavior, and it takes into account the substantial losses caused by defendant's conduct.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Order of Disgorgement, Prejudgment Interest and Third-Tier Civil Penalties against Defendant Brian D. Fox and Brief in Support (Dkt. # 44) is **granted**

**IT IS FURTHER ORDERED** that the Unopposed Motion to Enter Final Judgment as to Defendant Brian D. Fox (Dkt. # 40) is **granted**, and the agreed judgment submitted by the parties, including the amount of disgorgement, prejudgment interest, and civil fine, will be entered forthworth.

**DATED** this 2nd day of November, 2012.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE